No. 94-2993

Robert Driscoll,                        *
                                        *
              Appellee,                 *
                                        *
        v.                              *
                                        *
Paul Delo,                              *
              Appellant.                *
                                        *

                                    Appeals from the United States
                                    District Court for the
                                    Eastern District of Missouri.

No. 94-3266

Robert Driscoll,                        *
                                        *
              Appellant,                *
                                        *
        v.                              *
                                        *
Paul Delo,                              *
                                        *
              Appellee.                 *

                    Submitted:  September 11, 1995

                    Filed:  December 4, 1995

Before HANSEN, HEANEY, and MURPHY, Circuit Judges.

HEANEY, Circuit Judge.

The State of Missouri appeals and petitioner Robert Driscoll, a/k/a Albert Eugene Johnson, cross-appeals from the district court's order granting Driscoll's 28 U.S.C. § 2254 petition for writ of habeas corpus. For the reasons stated below, we agree that a writ of habeas corpus should issue on three independent bases:

(1) Driscoll was denied the effective counsel guaranteed by the Sixth Amendment because his lawyer allowed the jury to retire with the factually inaccurate impression that the victim's blood was possibly on Driscoll's knife; (2) his trial counsel was also ineffective for failing to impeach a state eyewitness using his prior inconsistent statements; and (3) Driscoll's sentence violates the Eighth Amendment because the prosecutor made repeated statements to the jury that diminished the jury's sense of responsibility for its sentence of death.

I.  PROCEDURAL BACKGROUND

Driscoll is a state prisoner currently incarcerated at the Potosi Correctional Center in Mineral Point, Missouri.  On December 5, 1984, a jury found Driscoll guilty of capital murder in violation of Mo. Rev. Stat. § 565.001 (1978) (repealed effective October 1, 1984) in connection with the stabbing death of a corrections officer, Thomas Jackson, during a prison disturbance.[1]  On December 6, 1984, the jury recommended that Driscoll be sentenced to death; thereafter, on February 7, 1985, the state court sentenced him to death by lethal gas.  The Missouri State Supreme Court affirmed Driscoll's conviction and sentence on direct appeal.  State v. Driscoll, 711 S.W.2d 512 (Mo.), cert. denied, 479

---

[1]Two other inmates, Rodney Carr and Roy Roberts, were also charged and separately convicted of capital murder in connection with the stabbing death of Officer Jackson.  Roberts was sentenced to death for his role in restraining officer Jackson while he was fatally stabbed.  State v. Roberts, 709 S.W.2d 857 (Mo.), cert. denied, 479 U.S. 946 (1986).  Carr was sentenced to life in prison without consideration of parole for fifty years.  State v. Carr, 708 S.W.2d 313 (Mo. Ct. App. 1986).

U.S. 922 (1986). Driscoll subsequently filed a motion for post-conviction relief in state court pursuant to Missouri Supreme Court Rule 27.26 (repealed effective January 1, 1988), which the trial court denied after an evidentiary hearing. The Missouri Supreme Court affirmed the denial of the motion. Driscoll v. State, 767 S.W.2d 5 (Mo.), cert. denied, 493 U.S. 874 (1989).

On October 6, 1989, Driscoll filed this petition for writ of habeas corpus in the United States District Court for the Eastern District of Missouri. The court appointed counsel to assist Driscoll and on October 22, 1990, Driscoll filed an amended petition asserting the following general claims for relief: (1) he was denied effective assistance of counsel in violation of the Sixth Amendment because of multiple alleged errors on the part of his trial counsel; (2) he was denied due process of law in violation of the Fifth Amendment as a result of multiple trial court errors; (3) Driscoll's grand and petit jury pools did not represent fair cross sections of the community in violation of due process; (4) the Missouri death penalty statute is unconstitutional because it affords the prosecuting attorney unbridled discretion to seek the death penalty in a discriminatory manner; and (5) numerous other claims under the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments.

The district court referred all pretrial matters to the magistrate judge. After conducting a de novo review of the record, including consideration of the parties' objections to the magistrate judge's report and recommendation, the district court adopted the report of the magistrate judge and granted Driscoll's habeas corpus petition on July 8, 1994.

The district court found seven distinct bases on which it granted petitioner habeas corpus relief: four instances of ineffective assistance of counsel and three instances of due

process violations.[2]    The court determined that Driscoll received ineffective assistance of counsel because his trial counsel (1) did not adequately prepare for the introduction of blood identification evidence at trial and failed to adequately cross-examine the state's serology expert on the crucial issue of blood identification testing methodology, (2) failed to adequately cross-examine a state eyewitness regarding prior inconsistent statements, (3) failed to object to repeated statements by the prosecutor to the jury that minimized the jury's sense of responsibility in recommending a sentence of death, and (4) did not request a jury instruction on the lesser-included offense of second degree felony murder. In addition, the court determined that a writ of habeas corpus was warranted because Driscoll's trial was tainted by the following due process violations:    (1) the court's failure to curtail, sua sponte, the prosecutor's repeated statements to the jury that minimized the jury's sense of responsibility for recommending a sentence of death; (2) the court's failure to instruct the jury, sua sponte, on the lesser-included offense of second degree felony murder; and (3) allowing the state to offer improper rebuttal testimony.

We will consider each of these grounds in turn after a recitation of the factual background necessary to reach our determination.

---

[2]The district court either dismissed or rejected the rest of Driscoll's claims.  Many claims in Driscoll's petition had been extinguished due to procedural default unexcused for cause.  The district court denied the remainder of his claims on their merits. After carefully reviewing the full record on appeal, we affirm the district court's judgment with respect to these claims.  In so doing, we thereby reject the claims raised by Driscoll in his cross-appeal.

II.  FACTUAL BACKGROUND

Driscoll was convicted of capital murder and sentenced to death for his role in the stabbing death of Officer Tom Jackson at the Missouri Training Center for Men (MTCM) in Moberly, Missouri on July 3, 1983. Driscoll was one of the 459 prisoners housed in Unit 2, an X-shaped building consisting of four cell wings (designated "A" through "D") branching from a central rotunda where guards monitored security from a circular desk called the control center. Reinforced glass doors secured the rotunda from the housing wings and provided the only entrance to and from each cell wing. Because MTCM is a medium-security institution, each inmate is permitted to keep a key to his cell and can generally move freely within his wing.

Beginning during the day of July 3, 1983 and continuing into the night, inmates in Unit 2B were drinking homemade alcohol and smuggled, store-bought whisky. The center of this activity, cell 2B-410, housed Driscoll and his cellmate, Jimmie Jenkins. Officer Jackson was one of three guards assigned to monitor security in Unit 2 that night. By regulation, Jackson was unarmed. By nighttime, Jenkins had become exceedingly disruptive. At approximately 9:45 p.m., Officer Jackson entered Unit 2B to remove Jenkins from the wing. Jenkins refused to comply with Jackson's instructions to follow him out of the wing. Officer Jackson returned to the control center and requested help. While Officer Jackson waited for assistance, Driscoll assembled a homemade knife from parts he had collected and hidden in his cell.[3]

---

[3]Later, after quieting the ensuing disturbance, investigators retrieved at least thirteen similar homemade knives from the wing. Authorities were still discovering knives possibly associated with the July 3, 1983 incident as late as the weeks immediately preceding Driscoll's trial. Officer Darnell testified that he discovered fifteen to twenty knives and other weapons during the shakedown of the cells after the disturbance. He further testified that three of the knives appeared to have blood on them. A total of fourteen knives (and other types of weapons) were submitted to the forensic laboratory for testing. Of those, only the knife connected to Driscoll tested positive for blood. Therefore, either Darnell made a mistake in his recollection or one or more of the

Officer Jackson and two additional guards returned to the housing unit to remove Jenkins. The two other guards escorted Jenkins from the wing to the control center--one guard on each side of the prisoner--while Jackson trailed some distance behind. At that point, a group of twenty to thirty inmates from the wing, including Driscoll, charged the guards. The two guards escorting Jenkins made it to the rotunda where more guards were assembling to help control the situation; a crowd of prisoners, however, stopped Officer Jackson several feet short of the door. Jackson was restrained, beaten, and stabbed four times. At trial, the state advanced the theory that Driscoll stabbed Jackson three times, fatally penetrating his heart and lungs, and then stabbed another officer, Harold Maupin, in the shoulder as Maupin tried to rescue Jackson.

For a brief period, uncontrolled fighting between prisoners and guards raged both in the control center and just outside. After several thwarted attempts to rescue Jackson, guards successfully pulled him through the door into the rotunda. Jackson's shirt was covered in blood. The guards managed to control the worst of the fighting within a few minutes. Reinforcement guards herded inmates back to their cells by firing sixty to eighty shotgun blasts into the floor and ceiling of the housing wings. At some point, Driscoll returned to his cell and changed his clothes.

At the end of the fighting, Officer Jackson was dead and five other guards had been stabbed or otherwise injured. At least thirty inmates required treatment for their injuries; one prisoner was seriously wounded by a shotgun pellet. At trial, Driscoll

---

bloody knives were lost.

-6-

presented substantial evidence that during the night of July 3rd and into the following day guards subjected the inmates of Unit 2B to brutal beatings in response to the incident. Driscoll's injuries, for example, required him to spend forty days in the prison hospital.

On July 4, 1983, just prior to his transfer to the Missouri State Penitentiary in Jefferson City, Missouri, Driscoll made an incriminating statement to investigating officers from MTCM and the Highway Patrol. In the statement, Driscoll admits that he "stabbed at" an officer after he was hit by someone. He stated that he did not know at which officer he stabbed or if he stabbed at the officer more than once. The trial court admitted the statement into evidence over Driscoll's objection that it was coerced and involuntary. Other evidence against Driscoll included the eyewitness testimony of two inmates and incriminating statements Driscoll reportedly made to other inmates right after the fighting. Three guards testifying for the prosecution, however, identified another inmate, Rodney Carr, as the person they saw stab Officer Jackson. No guard saw Driscoll stab Jackson.

III. DISCUSSION

A. Ineffective Assistance of Counsel: Defense Handling of Serology Evidence

The Sixth Amendment guarantees a criminal defendant charged with a serious crime the right not merely to counsel, but to the effective assistance of counsel. United States v. Cronic, 466 U.S. 648, 654 (1984). Any other interpretation of that right would permit a serious risk of injustice to infect criminal trials. Cuyler v. Sullivan, 446 U.S. 335, 343 (1980). "Absent competent counsel, ready and able to subject the prosecution's case to the 'crucible of meaningful adversarial testing,' there can be no guarantee that the adversarial system will function properly to

-7-

produce just and reliable results."  <u>Lockhart v. Fretwell</u>, 113 S. Ct. 838, 847 (1993) (Stevens, J., dissenting) (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 654 (1984)).

The United States Supreme Court set out the standard for our review of claims of ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  The analysis is twofold:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

<u>Strickland</u>, 466 U.S. at 687.

With respect to the performance aspect of the test, the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.  <u>Id.</u> at 688.  Our review of counsel's performance must be highly deferential; we indulge a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance and sound trial strategy.  <u>Id.</u> at 689.  For that reason,

> strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

<u>Id.</u> at 690.  Moreover, as instructed by the Supreme Court, we must "make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

conduct, and to evaluate the conduct from counsel's perspective at the time [of trial]." Id. at 689.

Professionally unreasonable trial errors, however, do not satisfy the burden of proving ineffectiveness absent a showing of prejudice to the defendant. We will set aside the judgment of conviction only when the defendant demonstrates that there is a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. Id. at 694. In other words, a defendant who challenges his or her conviction is prejudiced by counsel's unprofessional conduct when "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. In determining prejudice, we consider all the evidence presented to the jury; we are mindful that some trial errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, whereas other errors will have produced only a trivial, isolated effect. Id. at 695-96.

The question of whether Driscoll's Sixth Amendment rights were violated because he received ineffective assistance of counsel is a legal one subject to our de novo review. Starr v. Lockhart, 23 F.3d 1280, 1284 (8th Cir. 1994). The state court's underlying factual findings related to counsel's performance and prejudice to the defendant are entitled to the presumption of correctness as set forth in 28 U.S.C. § 2254(d). Miller v. Fenton, 474 U.S. 104, 112 (1985).

The district court granted Driscoll habeas corpus relief and ordered that he receive a new trial because his counsel was ineffective in allowing the jury to retire with the factually inaccurate impression that the victim's blood could have been present on Driscoll's knife. On appeal, the state argues that Driscoll failed to establish that defense counsel's handling of the

serology evidence either constituted unreasonable performance or caused Driscoll prejudice.  The state contends that the district court did not engage in the required two-part Strickland analysis;  specifically, that the court failed to consider whether the asserted errors by counsel prejudiced the defendant.  While we acknowledge the shortcomings of the district court's consideration of prejudice, we reject the state's basic argument after engaging in the full, two-part Strickland review de novo.



Kwei Lee Su, Ph.D., Chief Forensic Serologist with the Missouri Highway Patrol Crime Laboratory, testified for the state at Driscoll's trial.  Dr. Su conducted all the serological examinations on the state's evidence, which included a homemade knife belonging to Driscoll, thirteen additional homemade knives discovered during the investigation of the riot, the clothes worn by Officer Jackson at the time he was killed, and the clothes worn by various inmates, including Driscoll, on the night of the riot.

Before trial, the state provided Driscoll's lawyer with a three-page laboratory report that summarized the latent fingerprint, serological, and chemical examinations performed on the state's evidence.  The first page of the report lists the specimens submitted to the laboratory for examination.  The second page provides a brief, narrative summary of the results.  The final page of the report contains a more comprehensive table that summarizes the results of the serology tests performed on the state's evidence.  According to the laboratory report, the blood found on Driscoll's clothing--type O--matched Officer Jackson's blood type.  All of the homemade knives except for Driscoll's tested negative for blood traces. The blood traces found on Driscoll's knife were of type A--the same blood type of Officer Maupin, but not of the victim, Officer Jackson.  The table also indicates that Jackson's dress boots tested positive for both "A & O" type blood.

At trial, the state advanced two alternative theories to explain the lack of the victim's blood on the alleged murder weapon: either that the type O blood on Driscoll's knife got wiped off when Driscoll subsequently stabbed Officer Maupin or that type O blood was present on the knife, but "masked" from detection because of the additional presence of type A blood.

With respect to the masking theory, Dr. Su testified that blood can be type A, type B, type AB, or type O. Using a "thread" or "antigen" test, Dr. Su explained, a reagent called anti-A is added to the blood and agglutination (clumping) occurs if the blood is type A. Similar reagents signal the presence of type B and of type AB. Using this methodology, however, the presence of type O blood is signaled only by the absence of a reaction to anti-A and anti-B reagents. Thus, when type A blood and type O blood are mixed, the antigen test will not reveal the presence of the type O blood because the agglutination showing type A will occur. Dr. Su testified that with the antigen test type A blood "masks" the presence of type O blood.

Neither the prosecution nor the defense on cross-examination ever asked Dr. Su whether she used any other blood identification methods or whether she could have employed any other tests to establish with certainty the presence or absence of type O blood on Driscoll's knife. Driscoll's trial counsel asked Dr. Su only two questions on cross-examination: whether the only thing Dr. Su could say with any degree of medical certainty was that Driscoll's knife had blood type A on it and whether "anything else would just be speculation." Dr. Su answered affirmatively to both.

In fact, Dr. Su had performed another test on the knife, called the "lattes" antibody test. Like the thread test, the lattes test can determine the presence of each type of blood; unlike the thread test, however, no masking can occur with the lattes test. Using the lattes test, Dr. Su discovered no type O

blood on Driscoll's knife. The jury was never informed that the lattes test was performed or that no type O blood was on the knife. At Driscoll's Rule 27.26 state post-conviction hearing, Dr. Su was asked: "If you had been asked at trial regarding the antibody test, you could have testified that there was no O blood on the knife," to which she answered "yes." Hr'g Tr. at 32. She was also asked whether, if asked at trial, she could have testified that there had not been type O blood on the knife "at some time." Dr. Su responded: "It was not detected if it was there." Id.

In addition, at the Rule 27.26 hearing, Driscoll's trial lawyer testified that he did not interview Dr. Su prior to the time she gave her testimony. He admitted that he did not take any steps to adequately inform himself about the specific serology tests performed or the conclusions one could logically draw from the laboratory results. The record indicates that trial counsel simply reviewed the three-page summary of the serology evidence, noted that the tests did not demonstrate the existence of the victim's blood on Driscoll's knife, and "didn't see how it was going to hurt [him]." Hr'g Tr. at 91. He testified later that at the time of trial he was not aware of any scientific evidence that could have rebutted the state's serology evidence.

The combination of the prosecution's presentation of serology evidence and the defense's total lack of rebuttal left the jury with the impression that Driscoll's knife likely had been exposed to both type A blood and type O blood. In its closing argument, the state made much of the masking theory, turning unfavorable serology evidence into neutral evidence at worst:

> The issue of the knife on the blood [sic] doesn't really prove anything. What it is is a neutral issue. . . . [W]hen you mix O and A together . . . it's going to react with the A part in the smudge and it's going to tell you that there is A there, but the O is undetectable.

And in this situation, what we have is we have this magic combination. Tom Jackson had O-type blood. Harold Maupin had A-type blood. . . . [Y]ou're going to get the A-type reaction.

Now, I think, as you analyze the blood on the knife, you're going to understand that the blood on the knife is a neutral issue. Obviously the defense is going to make--you know--big work of that. But that's not significant at all. Chemically--the manner in which they test antigens in the A-type blood, it explains why you can't detect whether O is present when A and O are mixed.

. . . .

Also, the other reason why is the in and out. The stabbing [Jackson] in the chest, the pulling it out and the stabbing [Maupin] in the arm. Because it's a chemical fact of life. If you mix O and A together, you drop the dropper of stuff on it, and the presence of A mixed with O will cause a reaction under the microscope, which leads you to the logical conclusion that A is present. Now, that's just the way God made us.

Trial Tr. at 1929-30. In his closing argument, Driscoll's counsel merely reminded the jury that he had elicited the statement from Dr. Su on cross-examination that the only thing beyond speculation was that blood type A was on Driscoll's knife. He then deduced that the prosecutor "didn't get all the evidence out of her he wanted" because the state later brought another witness, Chief of Police James Simmerman, who essentially testified to the same possibility of wiping that Dr. Su did.

The questions now before us are (1) whether defense counsel's performance in failing to investigate and to adequately cross-examine Dr. Su about the serology tests performed on the state's evidence fell below an objectively reasonable standard of representation; and (2) if so, whether Driscoll was prejudiced by these failures. We answer both questions in the affirmative.

Although our scrutiny of defense counsel's performance is deferential and we presume his conduct to fall within the wide

-13-

range of competence demanded of attorneys under like circumstances, Strickland, 466 U.S. at 687-89, "when the appellant shows that defense counsel 'failed to exercise the customary skills and diligence that a reasonably competent attorney would exhibit under similar circumstances,' that presumption must fail." Starr v. Lockhart, 23 F.3d 1280, 1884 (8th Cir. 1994) (quoting Hayes v. Lockhardt, 766 F.2d 1247, 1251 (8th Cir.), cert. denied, 474 U.S. 922 (1985)), cert. denied, 115 S. Ct. 494 (1994). Driscoll faced a charge of capital murder and the possibility of the death sentence if convicted. Whether or not the alleged murder weapon--which was unquestionably linked to the defendant--had blood matching the victim's constituted an issue of the utmost importance. Under these circumstances, a reasonable defense lawyer would take some measures to understand the laboratory tests performed and the inferences that one could logically draw from the results. At the very least, any reasonable attorney under the circumstances would study the state's laboratory report with sufficient care so that if the prosecution advanced a theory at trial that was at odds with the serology evidence, the defense would be in a position to expose it on cross-examination.

Here, the state explained the lack of the victim's blood on the defendant's knife by telling the jury, in essence, that although both type A and type O blood were on the knife, the serology test could only detect type A. In fact, another test had been performed that conclusively disproved that theory. A reasonable defense lawyer would have been alerted to the possibility of conclusively detecting both A and O on the same item of evidence by the laboratory report itself. Whereas the report indicates that only type A was found on Driscoll's knife and that only type O was found on Jackson's clothes and on Driscoll's pants, the report indicates that both type A and type O blood were

-14-

detected on Jackson's dress boots.[4]  Considering the circumstances as a whole, defense counsel's failures to prepare for the introduction of the serology evidence, to subject the state's theories to the rigors of adversarial testing, and to prevent the jury from retiring with an inaccurate impression that the victim's blood might have been present on the defendant's knife fall short of reasonableness under the prevailing professional norms.

Applying the second prong of the Strickland analysis, we conclude that the inadequate performance of his lawyer prejudiced Driscoll.  There is a reasonable probability that, absent these errors, the jury would have found reasonable doubt with respect to Driscoll's guilt.  In addition to the serology evidence in question, the state's case against Driscoll rested primarily on the presence of the victim's blood on Driscoll's pants, the suspect eyewitness testimony of prisoners involved in the riot, and the incriminating statement Driscoll gave to investigators in which he admitted "stabbing at an officer."  Given that the trial evidence established that Driscoll stabbed Officer Maupin--who has blood type A--and that the guards who actually saw an inmate stab officer Jackson identified Carr as the assailant, we cannot say that had the jury been made aware that the victim's blood was conclusively absent from Driscoll's knife it still would have found him guilty of Jackson's murder.  Thus, we agree with the district court that defense counsel was ineffective.

_____

[4]We also note that with respect to some of the items of evidence the blood detection and typing table indicates "IC," meaning inconclusive, under the column indicating the blood type. Thus, the logical inference is that where a specific blood type (or types) was determined, it had been determined conclusively.

-15-

B.    Ineffective Assistance of Counsel:  Failure to Impeach
      State's Eyewitness with Prior Inconsistent Statements


     The district court also found that Driscoll's trial counsel provided
ineffective assistance by failing to impeach the testimony of one of the
state's witnesses using evidence of prior inconsistent statements.  We
agree with the district court's decision.


     At Driscoll's trial, the state offered the eyewitness testimony of
two inmates, Joseph Vogelpohl and Edward Ruegg.  First, Vogelpohl took the
stand and told the jury that he saw Driscoll stab Officer Jackson in the
upper left part of his chest.  Trial Tr. at 909.  Vogelpohl also testified
that after witnessing Driscoll stab Jackson, he returned to Driscoll's cell
to continue watching television as he had been before the disturbance
began.  According to Vogelpohl, Driscoll returned to his cell a while later
and, before changing his clothes, said to Vogelpohl:  "Did I take him out,
JoJo, or did I take him out."  Trial Tr. at 922.  On cross-examination,
Driscoll's lawyer questioned Vogelpohl about his prior convictions, Trial
Tr. at 926-27, about his intoxication level on the night in question, Trial
Tr. at 945-46, about the beatings he and other inmates received from
corrections officers after the riot, Trial Tr. at 935-38, and about whether
he had discussed the case with other inmates, Trial Tr. at 931-33.
Driscoll's lawyer also raised some question as to whether Vogelpohl also
possessed a knife.  Trial Tr. at 948-52.


     In his petition, Driscoll asserts that his counsel was ineffective,
however, because he failed to impeach Vogelpohl's testimony with evidence
that Vogelpohl had made prior inconsistent statements to investigators.
Shortly after the incident at MTCM, Vogelpohl had given a statement to two
investigating officers.  According to one of the officer's notes, Vogelpohl
told them that when Driscoll returned to his cell he told Vogelpohl that
one of

the officers "had been stuck." Hr'g Tr. at 21. Shortly thereafter, Vogelpohl had given a second statement to a different investigator. According to that investigator's interpretation of Vogelpohl's statement, Driscoll told Vogelpohl "that [Driscoll] or someone took out a guard." Hr'g Tr. at 47. In his statements prior to trial, Vogelpohl did not say that Driscoll admitted to stabbing Officer Jackson, much less that Vogelpohl witnessed Driscoll stab Jackson.

Driscoll's lawyer, who knew about Vogelpohl's statements to investigators, never questioned him about the inconsistencies between those prior statements and his testimony at trial.[5] In fact, counsel never made the jury aware of Vogelpohl's prior statements. Driscoll's trial counsel subsequently testified that this omission was not a matter of trial strategy.[6] Moreover, we

---

[5]On appeal, the state argues that we are bound, under 28 U.S.C. § 2254(d), by the Missouri Supreme Court's factual determination that Vogelpohl's prior statements were consistent with his trial testimony. See Driscoll v. State, 767 S.W.2d 5, 14 (Mo.), cert. denied, 493 U.S. 874 (1989). We note that the Missouri Supreme Court merely concluded that the trial court did not commit plain error by determining that the statements were not directly inconsistent with Vogelpohl's trial testimony. Assuming that the consistency of Vogelpohl's statements constitutes a factual finding, it is unprotected by the presumption of correctness because it is not fairly supported by the record. 28 U.S.C. § 2254(d)(8).

[6]At Driscoll's Rule 27.26 hearing in state court, his trial counsel explained: "[Vogelpohl] was about as hostile as a witness could be. He was the State's witness and he was completely uncooperative and fairly well, what I would assume, was coached as to what he was going to say." Hr'g Tr. at 61. With respect to Vogelpohl's prior inconsistent statements, trial counsel gave the following answers to questions:

Q: Okay. Now, you were asked about these statements of Mr. Vogelpohl to both [Investigator] Schreiber and [Investigator] Wilkinson. If Mr. Schreiber testified that Vogelpohl -- Vogelpohl said to Schreiber that Mr. Driscoll had said to him, quote, "One of the officers, which was Officer Jackson, had been stuck," end quote. And then

-17-

conclude that there is no objectively reasonable basis on which competent defense counsel could justify a decision not to impeach a state's eyewitness whose testimony, as the district court points out, took on such remarkable detail and clarity over time.

The question, therefore, becomes whether Driscoll was prejudiced by his counsel's deficient performance. The state offered the testimony of another witness, Edward Ruegg, who, like Driscoll, admitted to taking part in the fighting that night. Ruegg testified that he saw Driscoll stab Officer Jackson three or four times and that he saw the knife penetrate Jackson's chest once. Trial Tr. at 1042-43. On cross-examination, Ruegg testified that he was badly beaten during and after the riot and that he was afraid for his life when he gave a statement to investigators. Ruegg admitted:

> . . . I told [the investigators] anything they wanted to hear--I just wanted to tell them something. So they--I mean, virtually I told them anything they wanted to hear

---

Vogelpohl testified at trial that Mr. Driscoll had said to him, "Did I take him out, JoJo, or did I take him out." Do you agree that those two statements can be construed as being inconsistent?

. . . .

    A: Okay. Yes, that's inconsistent.

. . . .

    Q: Okay. Would it have been consistent with your trial strategy to bring up that statement of---

    A: Yes, it would have.

    Q: Was there any matter of trial strategy involved in not bringing up that prior inconsistent statement to Mr. Schreiber?

    A: No, there was not.

Hr'g Tr. at 77-78.

-18-

just so they would leave me alone and because I knew I
had to go back to population with regular inmates.

Trial Tr. at 1058-59. Driscoll later presented the testimony of another
inmate who said that Ruegg admitted to him that he did not see who stabbed
Jackson. Trial Tr. at 1593 (Lassen testimony).

As the Supreme Court recognized in Strickland, "[s]ome errors will
have had a pervasive effect on the inferences to be drawn from the
evidence, altering the entire evidentiary picture . . . ." Strickland, 444
U.S. at 695-96. Vogelpohl testified before Ruegg did. The apparent
strength of Vogelpohl's claim to have seen the same events that Ruegg later
testified to seeing must have offset, in the minds of the jurors, Ruegg's
admission that he was scared enough to say anything that he thought the
investigators wanted to hear.[7] We agree with the district court that
counsel's failure to impeach Vogelpohl was a breach with so much potential
to infect other evidence that, without it, there is a reasonable
probability that the jury would find reasonable doubt of Driscoll's guilt.
Therefore, his trial counsel's omission amounted to a deprivation of
Driscoll's Sixth Amendment right to counsel.

C.    Prosecutor's Misleading Statements to the Jury Regarding
      Its Sentencing Responsibility

      1.   Eighth Amendment

---

[7]Besides Vogelpohl and Ruegg, the only inmate to actively
implicate Driscoll in Jackson's murder was Jimmie Jenkins,
Driscoll's cellmate and the person whose removal from the wing
provoked the disturbance. Although he did not claim to have
witnessed the stabbing, Jenkins testified that Driscoll ran up to
him immediately after the fighting and said, "I killed the freak."
On cross-examination, defense counsel impeached Jenkins--in the
very way he failed to impeach Vogelpohl--by eliciting from him the
fact that in two prior statements Jenkins gave investigators
immediately following the riot, he never mentioned Driscoll's
supposed statement to him.

-19-

The district court accepted Driscoll's claim that the trial court denied Driscoll his Fifth Amendment right to due process of law because it failed, sua sponte, to curtail the repeated efforts by the prosecution to minimize the jury's sense of responsibility for sentencing Driscoll to death. We need not decide whether the district court correctly determined that the trial court's failure to admonish the prosecutor violated Driscoll's due process rights. Rupp v. Omaha Indian Tribe, 45 F.3d 1241, 1244 (8th Cir. 1995) ("We may affirm the judgment of the district court on any ground supported by the record, even if the district court did not rely on it.") (citing Monterey Dev. v. Lawyer's Title Ins., 4 F.3d 605, 608 (8th Cir. 1993). Instead, we conclude that Driscoll was sentenced to death in violation the Eighth Amendment because the sentencing jury was misled by the prosecutor to believe that the ultimate responsibility for its decision rested elsewhere.

Throughout the trial, the prosecution made statements to the jury that were calculated to diminish the degree of responsibility the jury would feel in recommending a sentence of death. The prosecutor repeatedly referred to the judge as the "thirteenth juror" and explained that the jury's sentence of death would be a mere recommendation to the judge; in his most egregious statements, the prosecutor announced that "juries do not sentence people to death in Missouri," and, at one point, even told jurors it did not matter whether they returned a recommendation for the death penalty

because the judge can simply overrule their decision.[8]  Driscoll's

---

[8]The following references, although certainly not exhaustive, provide a representative sample of the prosecutor's remarks:

> Now, is there any question about the fact that a jury who returns a verdict of a recommendation of death, that it's only a recommendation to the Court, who later sentences the defendant?  <u>Does everybody understand that?  Okay.  Because juries don't sentence people to death in Missouri</u>.  Trial Tr. at 540 (voir dire) (emphasis added).

> . . . .

> Now, lest you get another misconception--you're not the only ones voting as jurors.  The Judge has a vote.  It's really thirteen votes.  But the Judge's vote is a veto vote.  <u>It doesn't matter whether you return a recommendation for the death penalty</u>.  The judge can overrule you and still give the defendant fifty years in prison without parole--after looking more in the defendant's background, et cetera--and those kinds of things.  Trial Tr. at 555 (voir dire) (emphasis added).

> . . . .

> Well, I'll tell you.  What's going to happen to Bobby Driscoll is it's going to depend on what the judge does.  And it's--in a way, it's certainly going to depend on what you do.  Trial Tr. at 2103 (closing argument).

> . . . .

> But when you've returned a verdict of--say a recommendation of death, you each have an individual vote. But also, the judge has a vote. Do you understand that?  In other words, it takes thirteen.  Trial Tr. at 481 (voir dire).

> . . . .

> The recommendation which you will make will be no more than a recommendation so that the Judge can consider when he is determining in his mind whether or not to sentence Driscoll to death--he'll have

counsel never objected to any of these statements at trial.

Our analysis is controlled by <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 239 (1985), in which the Supreme Court held it constitutionally impermissible to rest a death sentence on a determination made by a jury that has been led to believe that the responsibility for determining the appropriateness of the death sentence rests elsewhere. The Court decided <u>Caldwell</u> on June 11, 1985, before Driscoll's conviction became final.[9] Driscoll is thus entitled to the benefit of the Supreme Court's decision. <u>Cf.</u> <u>Sawyer v. Smith</u>, 497 U.S. 227 (1990) (holding that <u>Caldwell</u> announced a new rule as defined by <u>Teague v. Lane</u>, 489 U.S. 288 (1989)). Driscoll raised his substantive claim under <u>Caldwell</u> in the Missouri Supreme Court on both direct and collateral appeal, and the state court fully considered these claims on their merits. <u>State v. Driscoll</u>, 711 S.W.2d 512, 515-16 (Mo.), <u>cert. denied</u>, 479 U.S. 922 (1986) (direct appeal); <u>Driscoll v. State</u>, 767 S.W.2d 5, 9-10 (Mo.), <u>cert. denied</u>, 493 U.S. 874 (1989) (collateral appeal). Under 28 U.S.C. § 2254, however, we are not bound by the Missouri court's interpretation of the United States Constitution.

In <u>Caldwell</u>, the prosecutor minimized the importance of the jury's sentencing decision by telling the jury that the sentence it imposed would be reviewed for correctness on appeal. The Court concluded that the

---

that option. Trial Tr. at 2004 (closing argument).

. . . .

And you understand when I say "imposing" [the death penalty], what you're doing is recommending to Judge Long
to consider it? Trial Tr. at 580 (voir dire).

[9]Driscoll's trial commenced in state court on November 26, 1984; the court sentenced him to death on February 7, 1985. The Supreme Court granted certiorari in <u>Caldwell</u> on October 9, 1984, just before Driscoll's trial began. 469 U.S. 879 (1984). The Court decided <u>Caldwell</u>, however, on June 11, 1985, more than four months <u>before</u> Driscoll's case became final on October 20, 1986 when the Supreme Court denied Driscoll's petition for certiorari, <u>Driscoll v. Missouri</u>. 479 U.S. 922 (1986).

prosecutor's statements were impermissible because they gave the jury the false sense that the responsibility

for sentencing the defendant to death rested not with the jury, but with the state court of appeals.  The Court explained:

> The "delegation" of sentencing responsibility that the prosecutor here encouraged would thus not simply postpone the defendant's right to a fair determination of the appropriateness of his death; rather it would deprive him of that right, for an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance.

Caldwell, 472 U.S. at 330.  Our circuit recognized that Caldwell "condemns state-induced comments that 'mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'"  Gilmore v. Armontrout, 861 F.2d 1061, 1066 (8th Cir. 1988) (quoting Darden v. Wainwright, 477 U.S. 168, 184 n.15 (1986)).

In this case, the prosecutor's statements impermissibly misled the jury to minimize its role in the sentencing process under Missouri law.  Missouri's capital murder statute, under which Driscoll was convicted and sentenced to death, permitted imposition of a death sentence only if the jury unanimously voted for death, Mo. Rev. Stat. § 565.006 (Supp. 1982) (repealed effective October 1, 1984), after considering all relevant mitigating and aggravating factors, Mo. Rev. Stat. § 565.012.4 (1979) (repealed effective October 1, 1984).  Further, Missouri Supreme Court Rule 29.05 provides:  "The court shall have power to reduce the punishment within the statutory limits prescribed for the offense if it finds that the punishment is excessive."

Despite their technical accuracy under Missouri law, the prosecutor's statements were impermissible because they misled the jury as to its role in the sentencing process in a way that allowed the jury to feel less responsibility than it should for its sentencing decision.  For example, the prosecutor told the jury that (1) juries do not sentence defendants to death, and (2) it did

not matter whether the jury sentenced Driscoll to death because the judge could simply overrule their decision. Far from a decision that does not matter, a jury's determination to recommend a sentence of death is a matter of almost unparalleled importance. The judge could not have sentenced Driscoll to death absent the jury's recommendation to do so. Mo. Rev. Stat. § 565.006(2) (Supp. 1982) (repealed effective October 1, 1984). Moreover, for all practical purposes, a jury's recommendation of death is final.[10]

When we consider the prosecutor's statements as a whole, we conclude that they implicate the exact concerns that are at the heart of Caldwell: They fundamentally misrepresented the significance of the jury's role and responsibility as a capital sentencer and misled the jury as to the nature of the judge's review of its sentencing determination. See Caldwell, 472 U.S. at 336; see also id. at 342-43 (O'Connor, J., concurring) ("[T]here can be no 'valid state penological interest' in imparting inaccurate or misleading information that minimizes the importance of the jury's deliberations in a capital sentencing case."). The prosecutor essentially told the jury that it could defer the extremely difficult decision of whether or not Driscoll should be sentenced to death. As a consequence, the jury made the decision that Driscoll would be killed without full recognition of the importance and finality of doing so and, therefore, without affording the decision the full consideration it required. Driscoll's death sentence does not meet the standard of reliability

---

[10]Although Missouri Supreme Court Rule 29.05 technically vests the trial court with the power to reduce a jury-imposed sentence which it deems "excessive," since Missouri reenacted the death penalty in the late 1970's, "[n]o judge has ever spared a murderer the death penalty when a jury has recommended it." William C. Lhotka, Judges Back Juries on Death Penalty, St. Louis Post-Dispatch, December 6, 1992, at 9C. As one trial judge explains: "I can't imagine myself going against the cumulative wisdom of the jury. That's why we rely on the jury system." Id.

that the Eighth Amendment requires.  Thus, Driscoll's capital sentence is vacated and he is entitled to a new sentencing hearing.

    2.  Ineffective Assistance of Counsel

    The district court also granted Driscoll habeas relief because it concluded that his counsel was ineffective for failing to object to the repeated efforts by the prosecution to diminish the degree of responsibility the jury would feel in recommending a sentence of death as discussed above.  The district court, however, applied the wrong analysis to the claim of ineffectiveness, and instead treated it as if it were a substantive claim under Caldwell v. Mississippi, 472 U.S. 320 (1985).  Although handed down before Driscoll's conviction became final, Caldwell was not the law at the time of Driscoll's trial; moreover, the Court's decision in Caldwell was not dictated by the precedent existing at the time of Driscoll's trial.  Sawyer v. Smith, 497 U.S. 227, 235 (1990).  Therefore, his lawyer's effectiveness cannot be assessed in light of Caldwell's mandate.  We cannot require trial counsel to be clairvoyant of future Supreme Court decisions in order to provide effective assistance.  Horne v. Trickey, 895 F.2d 497, 500 (8th Cir. 1990).  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the time."  Strickland, 466 U.S. at 689.  Thus, we evaluate trial performance in light of the law and circumstances as they existed at the time of trial.  Blackmon v. White, 825 F.2d 1263, 1265 (8th Cir. 1987).

    Although misleading, the majority of the statements to which defense counsel failed to object constituted technically correct statements under Missouri's capital statute and Rule 29.05.  At the Rule 27.26 hearing in state court, Driscoll's trial counsel testified that, although he considered the prosecutor's comments

"offensive," he believed them to accurately reflect the law and he felt he had no basis on which to object.[11]  We have no reason to believe that the trial court would have sustained counsel's objections had he advanced them at trial.  Moreover, Driscoll's trial lawyer admitted to a general trial strategy that included minimizing the number of objections he made during the other side's closing argument.[12]  We must conclude that counsel's strategic decision not to object under the circumstances was objectively reasonable.  Because we conclude that Driscoll makes and insufficient showing that his trial lawyer's failure to object under the circumstances constituted inadequate performance, we need not discuss prejudice. Strickland, 466 U.S. at 699.

D.    Ineffective Assistance of Counsel:  Failure to Request a
      Jury Instruction on the Lesser-Included Offense of Second
      Degree Felony Murder

The district court also determined that Driscoll's trial counsel was constitutionally ineffective because he failed to request a jury instruction on the lesser-included, non-capital offense of second degree felony murder.  At Driscoll's trial, the jury retired with instructions on capital murder, as well as on the non-capital offenses of conventional second degree murder (intentional murder without deliberation) and manslaughter.  In his

---

[11]For example, when asked whether, at the time of trial, he believed that the prosecutor's statement that the judge imposes sentence on the defendant was a correct one he replied:  "What I believe was a correct statement of the law was that the Judge had the ability to override the jury sentence if--which, in fact, was the law."  Hr'g Tr. at 65.  He elaborated:  "Use of the term 'thirteenth juror' was offensive to me; but I thought his statement of the law was correct.  And I did not know that the statement was objectionable."  Hr'g Tr. at 82.

[12]At the Rule 27.26 hearing trial counsel stated:  "[I]t's my personal policy, in closing arguments, not to interrupt or make objections unless it's what I consider to be seriously damming [sic] to my case or something that's a flagrant misstatement of the facts as they were revealed at trial."  Hr'g Tr. at 84.

-27-

petition, Driscoll asserts that his counsel's failure to request the additional instruction constituted ineffectiveness in light of Beck v. Alabama, 447 U.S. 625 (1980) (holding that the death penalty may not be imposed when the jury is prohibited from considering a verdict of guilt of a lesser-included, non-capital offense). The state argues that Beck and its progeny require only that the jury be allowed to consider a "third option" besides finding the defendant guilty or not guilty of capital murder. We agree with the state's interpretation of the law under Beck.

In Beck v. Alabama, 447 U.S. 625 (1980), the Supreme Court held unconstitutional an Alabama statute that prohibited lesser-included offense instructions in capital cases. As the Court later explained:

> Our fundamental concern in [Beck] was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all. . . . We repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented.

Schad v. Arizona, 501 U.S. 624, 645 (1991) (internal quotation and citations omitted). As long as it considers a "third option," the reliability of the jury's capital murder conviction will not be diminished the way it is when the jury is forced into an all-or-nothing choice. Id.

This case, like Schad, does not implicate the central concern of Beck because the jury did not face an all-or-nothing choice. In addition to capital murder, the jury considered the lesser-included, non-capital offenses of second degree murder and manslaughter. The record indicates that Driscoll sought an

-28-

acquittal, not a conviction of a lesser offense.[13]  This fact explains his lawyer's strategic choice not to request an instruction on the additional lesser-included offense of second degree felony murder which would have necessarily emphasized Driscoll's admitted role in the riot.  We conclude that his counsel acted reasonably; as a consequence, Driscoll was not denied effective counsel by the omission.  Because Driscoll received effective assistance with respect to the challenged instructions, we reverse the district court.

E.  Remaining Claims

The district court found two additional bases to support Driscoll's claim that he was denied due process: (1) the trial court failed to instruct the jury, sua sponte, on the lesser-included offense of second degree felony murder; and (2) the trial court allowed the state to offer improper rebuttal testimony.  We reverse the district court on both grounds.  The first of these claims is disposed of by our discussion of Driscoll's trial counsel's performance with respect to the jury instructions, supra, Section III(D).  The court had no due process obligation to submit a particular lesser-included offense instruction to the jury.  With respect to the second contention, Missouri law provides that the scope of rebuttal testimony is left to the sound discretion of the trial court.  State v. Leisure, 749 S.W.2d 366, 380 (Mo. 1988).  Further, Driscoll raised this claim on direct appeal and the Missouri Supreme Court dismissed it as meritless.  Driscoll, 711

---

[13]As Driscoll's counsel later testified, his strategy at trial was "to put evidence on to the effect that other individuals stabbed Tom Jackson."  Hr'g Tr. at 63.  During his closing argument, Driscoll's lawyer argued that the state had failed to meet its burden of proof and that Driscoll was being used as a scapegoat for the murder of a corrections officer.  At one point he explained to the jury:  "Ordinarily, at this stage of the closing argument, the defense attorney is supposed to talk about reasonable doubt.  I'm  not going to go into that because there's mounds and mounds and mounds of doubt."  Trial Tr. at 1963.

S.W.2d at 518. In no event does the trial court's determination of this evidentiary issue rise to the level of a constitutional violation.

Finally, by affirming the district court's order in all other respects, supra n.2, we reject the claims raised by Driscoll in his cross-appeal.

IV. CONCLUSION

We affirm the district court's order, in part, concluding that a writ of habeas corpus should issue on three independent bases: (1) Driscoll was denied the effective counsel guaranteed by the Sixth Amendment because his lawyer allowed the jury to retire with the factually inaccurate impression that the victim's blood was possibly on Driscoll's knife; (2) his trial counsel was also ineffective for failing to impeach a state eyewitness using his prior inconsistent statements; and (3) the prosecutor's repeated statements to the jury impermissibly diminished the jury's sense of responsibility for its sentence of death and rendered Driscoll's death sentence infirm under the Eighth Amendment. The district court shall vacate Driscoll's conviction and sentence and order him released unless the state commences proceedings to retry him within 120 days.

We reverse the district court's order, in part, because we conclude that the following challenges to Driscoll's conviction do not warrant habeas corpus relief: (1) Driscoll's trial counsel was ineffective for failing to object to the prosecutor's misleading statements to the jury; (2) Driscoll received ineffective assistance of counsel as a result of his lawyer's failure to request a jury instruction on the lesser-included offense of second degree felony murder; (3) the trial court denied Driscoll due process of law by failing to, sua sponte, instruct the jury on second degree felony murder; and (4) the trial court denied

Driscoll due process of law by allowing the state to introduce rebuttal testimony.

HANSEN, Circuit Judge, concurring.

I concur in Parts I, II, III(A), III(C)(2), III(D), and III(E) of the court's opinion and in its judgment. I agree that Driscoll's defense counsel's performance at trial with respect to the serology evidence meets the first part of the Strickland test. It was of fundamental importance that the defense show conclusively (and with reasonable investigation and pretrial preparation it could have done so) that none of Officer Jackson's blood was on the knife the state claimed was used by Driscoll to murder the officer. I am also of the view that there is a reasonable probability that but for counsel's deficient performance, the result in the guilt phase of Driscoll's case would have been different. Moreover, and after considering the totality of the evidence, because of the crucial nature of this exculpatory evidence, my confidence in the outcome of the case is seriously undermined to the extent that I believe the result reached is unreliable. Lockhart v. Fretwell, 113 S. Ct. 838, 844 (1993); Strickland v. Washington, 466 U.S. 668, 687, 694 (1984).

Because I agree that Driscoll is entitled to a new trial, my respectful disagreements with the court's analysis and opinion with regard to Driscoll's Caldwell claim and with his claim concerning the cross-examination of the witness Joseph Vogelpohl (contained in Parts III(B) and III(C)(1) of the opinion) do not require explication except to say that I do not believe Driscoll has ever asserted the stand-alone Eighth Amendment Caldwell claim upon which the court today grants him relief. The Caldwell claim has always been made as a part of Driscoll's ineffective assistance of counsel claim, and as a claim that the state trial court denied him due process by not admonishing the prosecutor sua sponte concerning the complained-of comments. As indicated, I agree with the court's

-31-

conclusion that Driscoll's trial counsel could not be constitutionally ineffective for not making a <u>Caldwell</u> objection before <u>Caldwell</u> was decided.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.